CONSOLIDATED COMMUNICATIONS OF FORT BEND COMPANY and Consolidated Communications of Texas Company Plaintiffs,

v.

The PUBLIC UTILITY COMMISSION OF TEXAS and the Commissioners of the Public Utility Commission of Texas, Paul Hudson, Julie Caruthers Parsley, and Barry Smitherman, in Their Official Capacities and not as Individuals, and Sprint Communications Company, L.P. Defendants.

No. A–06–CA–825–LY.

United States District Court,
W.D. Texas,
Austin Division.

July 24, 2007.

Keith Gamel, Naman, Howell, Smith & Lee, Austin, Roy Lee Barrett, Naman, Howell, Smith Et Al, Waco, Stephen F. Morris, Naman Howell Smith & Lee, Austin, for Consolidated Communications of Fort Bend Company, Plaintiff.

Elizabeth R.B. Sterling, Office of the Attorney General, Natural Resources Division, Suzanne Antley, Texas Attorney General's Office, Natural Resources Division, Brian Alan Prestwood, Office of the Attorney General, Austin, Sprint Nextel Corporation, Overland Park, KS, Kathleen M. LaValle, Jackson Walker L.L.P., Dallas, Matt Middlebrooks, Jr., Sprint Nextel

Corporation, Austin, Patrick R. Cowlishaw, Jackson Walker L.L.P., Dallas, for The Public Utility Commission of Texas, Commissioner Paul Hudson In his official capacity and not as individual Company LP, Defendants.

## MEMORANDUM OPINION AND ORDER

LEE YEAKEL, District Judge.

BE IT REMEMBERED that on April 9, 2007, this Court called the above styled and numbered cause of action for trial. Plaintiffs Consolidated Communications of Fort Bend Company and Consolidated Communications of Texas Company ("Consolidated")[1], Defendants Public Utility Commission of Texas and the individually named commissioners, in their official capacity, ("the PUCT"), and Defendant Sprint Communications Co. ("Sprint") appeared by counsel. Consolidated, two incumbent local exchange carriers ("ILECs")[2], pursuant to the Telecommunications Act of 1996, Title 47 United States Code sections 151–615b ("the Telecommunications Act")[3], seek to overturn the PUCT's decision that terminated Consolidated's rural exemptions and compelled Consolidated to arbitrate an interconnection agreement with Sprint, a competitive local exchange carrier ("CLEC")[4] for the provision of telecommunications services. *See* Tex. Pub. Util. Comm'n, *Petition of Sprint Communications Co. L.P. To Terminate Rural Exemption As To Consolidated Communications of Fort Bend Co.*

*and Consolidated Communications of Tex. Co.*, Docket No. 32582, (Aug. 14, 2006) (final order granting petition) ("Final Order"). Having considered the agreed record (Clerk's Document No. 61), other unobjected-to and sealed exhibits (Clerk's Document Nos. 80 & 84), the parties' briefs on the merits (Clerk's Document Nos. 11, 71, 75, & 78), the entire file in this cause, the arguments of counsel, and the applicable law, the Court will deny Consolidated's requests for relief and will affirm the PUCT's Final Order.[5]

### Jurisdiction and venue

The Court has federal-question jurisdiction over this action. *See* 28 U.S.C. § 1331; *see also* 47 U.S.C. § 252(e)(6) ("In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251."). Additionally, venue is proper in the Austin Division of the Western District of Texas because the PUCT does business and regulates telecommunications carriers throughout the State of Texas and within the Western District of Texas, Austin Division. *See* 28 U.S.C. § 1391(b). The Court allowed Sprint to intervene as a matter of right and participate as a defendant in this action based on Sprint's direct and substantial interest in the outcome of this action (Clerk's Document No. 17). *See* Fed. R.Civ.P. 24(a)(2).

---

1. As the plaintiffs' interests are aligned, for convenience, the Court refers to them together as "Consolidated."

2. An "incumbent local exchange carrier" is defined as, with respect to an area, the local carrier that provides telephone exchange service in such area. *See* 47 U.S.C. § 251(h).

3. *See* 47 U.S.C. §§ 151–615b.

4. A "competitive local exchange carrier" is a carrier seeking to compete with a ILEC.

5. This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52(a). All findings of fact contained herein that are more appropriately considered conclusions of law are so deemed. Likewise, any conclusion of law more appropriately considered a finding of fact is so deemed.

## Statutory framework

Congress passed the Telecommunications Act to open local telecommunications markets to competition. *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). The Telecommunications Act fundamentally restructured local telephone markets, particularly by subjecting ILECs to several duties intended to facilitate competition in the telecommunications market, and provided that states may no longer enforce laws that impede competition in the telecommunications market. *Id.* Foremost among these duties is an ILEC's obligation to share its network, or interconnect, with competitors. *Id.*[6] Under the Telecommunications Act, "each telecommunications carrier has the duty to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers." 47 U.S.C. § 251(a)(1).[7] An ILEC may voluntarily reach an agreement with a CLEC to fulfill its duties under the Telecommunications Act, or should negotiations fail, through compelled arbitration before a state commission. *Id.* at §§ 251(c)(1), 252(b). In such an arbitration, the state commission must resolve those issues in accordance with the requirements of federal law. *See id.* at § 252(c).

A company that qualifies as a rural ILEC[8] is exempt from the duties described in section 251(c) and is relieved of the duty to negotiate an interconnection agreement unless the state commission terminates the rural ILEC's exemptions. *See* 47 U.S.C. § 251(f)(1)(A). The Telecommunications Act provides a procedure for state commissions to follow to terminate rural exemptions, which may occur following the state commission receiving notice that a rural ILEC has received a *bona fide* request for interconnection and the state commission finds: (1) that the requested interconnection is not unduly economically burdensome; (2) the requested interconnection is technically feasible; and (3) the interconnection is consistent with the universal service principles set forth in section 254 of the Act. *Id.*

## Background

In January 2005, Sprint, which does not serve customers in Consolidated's service area, sought to negotiate with Consolidat-

---

**6.** All ILECs have the duty to resale, provide number portability, to the extent technically feasible, provide dialing parity, afford access to the poles, ducts, conduits, and rights-of-way, and establish reciprocal compensation arrangements for the transport and termination of telecommunications. *See* 47 U.S.C. § 251(b).

In addition, ILECs also have a duty to: (1) negotiate in good faith the particular terms and conditions of agreements to fulfill these duties; (2) provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with particular aspects of the local exchange carrier's network; (3) provide any requesting telecommunications carrier nondiscriminatory access to network elements on an unbundled basis at any technically feasible point; (4) resale at wholesale rates any telecommunications service that the carrier provides at retail to sub-

scribers who are not telecommunications carriers; (5) provide public notice of changes; and (6) provide, on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, for physical collocation of equipment necessary for interconnection. *See* 47 U.S.C. § 251(c).

**7.** A "telecommunications carrier" is defined as "any provider of telecommunications services." *See* 47 U.S.C. § 153(44). A "telecommunications service" is defined as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." *Id.* at § 153(46).

**8.** Absent specific characteristics, a rural ILEC would, otherwise be considered an ILEC. *See* 47 U.S.C. § 153(37).

ed about interconnecting Sprint's facilities and equipment with Consolidated's network within Consolidated's local-exchange area in order to provide wholesale telecommunications services to entities that have last mile facilities suitable to function as residential loops.[9] *See generally* 47 U.S.C. §§ 251, 252. When Consolidated declined to negotiate with Sprint, on September 1, 2005, Sprint filed petitions with the PUCT asking it to compel Consolidated to arbitrate an interconnection agreement with Sprint.[10] On March 31, 2006, Sprint also filed a petition with the PUCT seeking termination of Consolidated's exemptions.[11] Following a contested hearing, by unanimous vote of the commissioners at a July 20, 2006 open meeting, the PUCT orally ruled to terminate Consolidated's exemptions, found that Sprint would be operating as a telecommunications or common carrier as to its request to interconnect with Consolidated, and ordered Consolidated and Sprint to arbitrate the terms of interconnection pursuant to a schedule to be set by the arbitrators. The Final Order, which reflects the PUCT's oral ruling and

about which Consolidated complains in this action, was signed by the commissioners on August 14, 2006.[12]

By the Final Order, the PUCT made findings of fact and conclusions of law. Its findings, *inter alia*, include the following, which the Court numbers to coincide with the PUCT's Final Order:

(11) Sprint has shown a sincere and clear intent to interconnect with Consolidated; (12) Sprint will provide telephone exchange service via its interconnection with Consolidated; (16) Sprint offers and will offer its services to all entities who desire to take them and who have comparable last mile facilities suitable to function as residential loops; (17) Sprint makes its wholesale offering generally known through its website, through presentations at industry trade shows, and through public press releases; (18) price variations among Sprint's interconnection agreements with its wholesale customers alone do not constitute a failure by Sprint to offer its services "indifferently"; and (19) the price variations

---

**9.** The connection from the customer's home to Sprint's switch is known as the last mile.

**10.** *See* 47 U.S.C. § 252(b); Tex. Pub. Util. Comm'n, *Petition of Sprint Communications Company, L.P. for Compulsory Arbitration under the FTA to Establish Terms and Conditions for Interconnection Terms with Consolidated Communications of Fort Bend Company,* (Docket No. 31577) and Tex. Pub. Util. Comm'n, *Petition of Sprint Communications Company, L.P. for Compulsory Arbitration under the FTA to Establish Terms and Conditions for Interconnection Terms with Consolidated Communications of Texas Company,* (Docket No. 31578). For ease of administration, the PUCT consolidated these proceedings into Docket Number 31577 by order signed October 5, 2006.

**11.** *See* 47 U.S.C. § 251(f)(1)(A); Tex. Pub. Util. Comm'n, *Petition of Sprint Communications Company, L.P. To Terminate Rural Exemption As To Consolidated Communications of Fort Bend Company and Consolidated Com-*

*munications of Texas Company,* (Rural Exemption Docket No. 32582). Sprint determined that it was necessary to petition the PUCT for termination of Consolidated's rural exemptions to be consistent with this Court's brethren's ruling that the PUCT "could not compel [a rural telephone company] to arbitrate an interconnection agreement with Sprint with respect to [the rural telephone company's] duties under § 251(a) and (b) of the [Act]." *See Sprint Communications Co. v. Pub. Util. Comm'n,* No. A–06–CA–065–SS, slip op. at 10, 2006 WL 4686875 (W.D.Tex. Aug. 14, 2006).

**12.** Tex. Pub. Util. Comm'n, *Petition of Sprint Communications Co. L.P. To Terminate Rural Exemption As To Consolidated Communications of Fort Bend Co. and Consolidated Communications of Tex. Co.,* Docket No. 32582, (Aug. 14, 2006) (final order granting petition) ("Final Order").

under Sprint's interconnection agreements with its wholesale customers will be cost-based.

Final Order at 11–12. The PUCT's conclusions of law, *inter alia*, include the following, which are again numbered as in the Final Order:

> (8) Sprint made a *bona fide* request for interconnection under [Title] 47 United States Code, section 251(c); (9) Under section 251(c), the requesting telecommunications carrier must act as a common carrier with respect to its request; (10) To be a common-carrier service: [1] the service must be offered to all potential users indifferently and [2] the carrier must allow customers to transmit information of the customer's own design and choosing; and (11) Sprint will be operating as a common carrier with respect to its interconnection with Consolidated.

Final Order at 14.

Consolidated and Sprint proceeded with their compulsory arbitration and the arbitrators signed an Arbitration Award on December 19, 2006.[13] By the Arbitration Award, the arbitrators outlined the decisions, terms, and conditions by which Consolidated and Sprint are to establish interconnection and allowed the parties until March 1, 2007 to fully implement interconnection.[14] The PUCT approved the Arbitration Award, with a modification, on January 31, 2007. On February 28, 2007, this Court ordered a preliminary injunction, which temporarily enjoins the enforcement of the Arbitration Award pending resolution of the merits of this cause and preserves the last peaceable *status quo* among the parties (Clerk's Document No. 72).

## Sprint's business model

Sprint's business model here is the same as has been subscribed to by many customers in other states as well as other areas in Texas. Sprint pairs with a participating cable company to together provide the required components for local telephone service and compete with ILECs to provide local telephone service. The cable company, or last-mile provider, supplies the connection between the end-user customer's home or business and Sprint's switch, which then connects the end-user's telephone call to another party. The cable company conducts the marketing and sales of the telephone service, administers the customer billing, and provides customer service. Sprint provides the switching service and other network components that carry a customer's telephone calls from Sprint's switch to the networks of other service providers. The switching service provided by Sprint is known as the Public Switched Telephone Network ("PTSN") interconnection. Sprint also uses existing phone numbers or acquires new numbers, provides all number administration functions, and performs the porting function of moving services from one phone number to another. Sprint also is responsible for all inter-carrier compensation, including exchange access and reciprocal compensation. Additionally, Sprint provisions 911 circuits, performs 911 database administration, and places directory listings in the directories of other carriers.

## Consolidated's contentions

Consolidated contends that the PUCT erred in ruling that Sprint, with regard to its request to interconnect with Consoli-

---

**13.** Tex. Pub. Util. Comm'n *Petition of Sprint Communications Company, L.P. For Compulsory Arbitration Under the FTA To Establish Terms And Conditions For Interconnection Terms With Consolidated Communications Of Fort Bend Company and Consolidated Com-* munications Company of Texas, Docket No. 31577, (Dec. 19, 2006).

**14.** The Arbitration Award provides that to "fully implement" means "all provisioning and testing is completed and the parties have the ability to exchange traffic."

dated's network, is a "telecommunications carrier" as that term is defined by the Telecommunications Act. *See* 47 U.S.C. § 153(44). Consolidated contends that based on what Sprint has failed to do-specifically, publish the terms and pricing of its services provided to its paired cable provider-Sprint is not a telecommunications carrier. Consolidated, without supporting statutory or caselaw authority argues, "Not surprisingly, [Consolidated has] not located a reported case specifically stating that a company cannot be a common carrier when it holds its rates confidential. Presumably, that is because common sense mandates such a conclusion." The crux of Consolidated's argument is that absent Sprint's making publicly available the rates and terms it negotiates with a cable provider, or other last-mile providers with facilities suitable to function as residential loops, Sprint cannot be afforded the status of a telecommunications or common carrier. Thus, Sprint is incapable of making a *bona fide* request for interconnection with Consolidated. *See* 47 U.S.C. § 251(f)(1). Further, Consolidated contends that, absent a *bona fide* request for interconnection, the PUCT lacks a prerequisite for ordering termination of Consolidated's exemptions, therefore, the PUCT, by its Final Order, erred in terminating the exemptions and also erred in compelling Consolidated to arbitrate terms of interconnection with Sprint.

The Court notes that Consolidated does not challenge the Commission's ruling that Sprint must act as a common-carrier service with regard to its request, nor does Consolidated challenge the PUCT's finding that Sprint's interconnection would impose no undue economic burden, is technically feasible, and is consistent with universal service public interest principles. *See id.* The Court's analysis focuses on whether the PUCT erred in finding and concluding that Sprint is a telecommunications or common carrier.

### *Standard of review*

In evaluating whether the PUCT's interpretation of the Telecommunications Act is correct, the Court, applies a *de novo* standard of review. *See Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 208 F.3d 475, 482 (5th Cir.2000). If the PUCT's interpretation is consistent with the Telecommunications Act, then the PUCT's resolution of all other issues, are reviewed under the "arbitrary and capricious" standard. *Id.* Under the arbitrary-and-capricious standard of review, the Court does not substitute its judgment for that of the agency. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Nevertheless, the agency must have examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made. *Id.* In reviewing the agency's explanation under this standard, the Court considers whether the agency's decision was based on consideration of the relevant factors and whether there has been a clear error of judgment. *Id.* In reviewing an agency determination that is "bound up with a record-based factual conclusion, the Court reviews the agency's decision to determine whether it is supported by substantial evidence." *Dickinson v. Zurko,* 527 U.S. 150, 164, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999).

### *Analysis*

As the sole issue in this case is whether Sprint is a telecommunications carrier, the Court reviews the applicable statutes and caselaw that govern such a determination. The Telecommunications Act defines the term "telecommunications carrier" as

any provider of telecommunications services, except that such term does not

include aggregators of telecommunications services (as defined in section 226 of this title). A telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services, except that the Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage.

47 U.S.C. § 153(44). Further, the Telecommunications Act defines the term "telecommunications service" as:

the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.

47 U.S.C. § 153(46).

■ Consolidated agrees with the PUCT's recognition in its Final Order that *National Association of Regulatory Utility Commissioners v. Federal Communications Commission ("NARUC I")* and its progeny established the test that is to be applied to Sprint's activities in determining whether Sprint is a telecommunications carrier under the Act. 525 F.2d 630, 642–43 (D.C.Cir.1976); *see also National Assoc. of Regulatory Util. Comm'rs v. Federal Communications Comm'n,* 533 F.2d 601 (D.C.Cir.1976) *("NARUC II"); Virgin Islands Tel. Corp. v. F.C.C.,* 198 F.3d 921, 926–27 (D.C.Cir.1999). Pursuant to *NARUC I,* to be a telecommunications carrier under the Telecommunications Act, Sprint must hold itself out "indiscriminately to the clientele one is suited to serve." 525 F.2d at 641. "The key factor is that the operator offer indiscriminate service to whatever public its service may legally and practically be of use." *Id.* at 642. Further, the services must be "effectively

available directly to the public." 47 U.S.C. § 153(46).

Consolidated's challenge is that Sprint is not holding itself out indiscriminately to the clientele one is suited to serve, which here, Consolidated contends are entities that have last mile facilities suitable to function as residential loops, because Sprint holds the pricing of its wholesale services confidential and provides its wholesale services to the last-mile providers under privately negotiated, individually crafted agreements.[15]

Sprint responds that, as its wholesale service tariff in Texas reflects, it incorporates individual case basis pricing, rather than fixed published rates, when contracting with cable companies. Sprint's position is that neither the negotiation of individual contracts with cable companies, nor the absence of a single published price list, detracts from Sprint's status as a telecommunications carrier entitled to request interconnection with Consolidated. Sprint's position is that it offers its services to such classes of users as to be effectively available directly to the public, regardless of the facilities used, in an indiscriminate manner to whatever public its services may legally and practically be of use.

■ The Court notes that the parties focus on different relationships: Consolidated focuses the Court toward the relationship between Sprint and the cable company, and Sprint focuses the Court toward the relationship between Sprint and the end-user customer. Based on Sprint's business model, without Sprint's services, the end-user customer who subscribes to the Sprint-cable company service would be incapable of placing or receiving telephone calls, as Sprint's switch performs all switching and routing func-

---

**15.** Consolidated does not challenge the PUCT's finding that Sprint allows customers to transmit information of the customer's own design and choosing.

tions for local, domestic, and foreign toll, emergency, operator assisted, and directory assistance calls. Thus, Sprint provides telecommunication services, and does so in a manner that offers indiscriminate service which is "effectively available directly to the public." Further Sprint's involvement in the *joint* provisioning of local telephone exchange service supports the PUCT's conclusion that Sprint is a telecommunications carrier. *See Berkshire Tel. Corp. v. Sprint,* No. 05–CV–6502, 2006 WL 3095665 (W.D.N.Y Oct. 30, 2006).

In *Berkshire,* the ILEC plaintiff, argued, as does Consolidated here, that it was not required to enter into an interconnection agreement with Sprint because Sprint was not a telecommunications carrier. *Id.* at *1. The *Berkshire* court, despite finding that the record failed to support the state commission's finding that Sprint was a common carrier, "insofar as that finding pertains to the services that Sprint provides to other telecommunications companies such as Time Warner," the court nevertheless determined that Sprint was a common carrier because "the services Sprint is providing . . . will be available to any end user within the specified service territory, albeit through the business relationship with [Time Warner]." *Id.* at *5–6. The relationship in *Berkshire* was that "Time Warner provides the local loop and Sprint provides the end office switch and interconnection trunk." *Id.* Thus, reasoned the *Berkshire* court, whatever the arrangements between Sprint and a participating cable company, ultimately Sprint's portion of the services offered would be available indiscriminately to the end user, even though the end user would only deal directly with the cable company, Time Warner. *Id.* at *6. The *Berkshire* court recognized that this arrangement was "an undisputedly new type of business arrangement" and held that it was

not erroneous for the [state commission] to consider the provision of services to

'Time Warner's customers' in deciding that Sprint is acting as a common carrier, since under this new business arrangement, the services being purchased are being provided only through the combined efforts of both companies, even though the end users deal directly with Time Warner.

*Id.* Further, with regard to whether Sprint was a common carrier as to the services it provides to other telecommunications companies, such as Time Warner, the *Berkshire* court determined the record lacked substantial evidence to make such a finding rather than that such a finding was impossible as a matter of law. *Id.* at *5.

■ This Court finds the *Berkshire* court's opinion persuasive, particularly in light of the purpose of the Telecommunications Act, which is to promote competition in the telecommunications market. *See AT & T Corp.,* 525 U.S. at 371, 119 S.Ct. 721. The Court observes that in this cause, Sprint's business model includes the same type of relationship between Sprint and a cable company as existed in *Berkshire* between Sprint and Time Warner. *Id.* Here, the PUCT found that Sprint "will offer its services to all entities *who desire to take them* and who have comparable 'last mile' facilities suitable to function as residential loops." Final Order at 12 (Emphasis added.) Although Consolidated does not challenge this finding of fact by the PUCT, it argues that the PUCT "made no finding that Sprint offers and will offer its services to all potential users indifferently." Consolidated contends that Sprint's service offerings differ depending upon the needs of each cable company, that Sprint will not disclose its prices for those services, and that Sprint's prices will vary among the cable companies. Consolidated contends that because of this, Sprint holds itself out differently by making individualized decisions as to

the same class of customers, the last mile providers, and by so doing is nothing more than a private carrier.

With this argument, Consolidated focuses away from the Sprint and end-user customer relationship and toward the relationship between Sprint and a cable company or other entity that would have last mile facilities suitable to function as residential loops. However, when focusing on the relationship of Sprint and the end-user customer, the Court finds the PUCT's finding (16) that Sprint's offer is to those "who desire to take them" is consistent with *NARUC I's* requirement that "to be a common carrier one must hold oneself out indiscriminately to the clientele one is suited to serve." 525 F.2d at 641. Sprint's business model provides that Sprint supplies the switching service and other network components, to the extent needed by various cable companies, that will carry *all* customers' telephone calls from Sprint's switch to the networks of other service providers. Based on the business model, Sprint also provides *all* number administration functions and performs the porting function for every telephone number. Further, Sprint also is responsible for all inter-carrier compensation, including exchange access and reciprocal compensation. Additionally, Sprint provisions 911 circuits, performs 911 database administration, and places directory listings in the directories of other carriers. Sprint, paired with a cable provider or other entity with last mile facilities suitable to function as residential loops, indiscriminately offers its services to the end-user customer.

■ Further, the Court notes that a common carrier's services need not be available to the entire public, as one may be a common carrier although the nature of the service rendered is "sufficiently specialized as to be of possible use to only a fraction of the total population." *Id.* But,

a carrier will not be a common carrier if its practice is to make individualized decisions, in particular cases, whether and on what terms to deal. *Id.* Again, the key factor is that the operator offer indiscriminate service to whatever public its service may legally and practically be of use. *Id.* at 642.

As in *Berkshire,* here Sprint's services-its connection and switching services-will be of use to the cable companies and any who have comparable last mile facilities suitable to function as residential loops as well as the end-user customer indiscriminately. Regardless of any agreement Sprint may negotiate with a participating cable company, or entity that has last mile facilities suitable to function as residential loops, Sprint's services will reach all end-user customers indiscriminately. This Court finds no error as regarding the PUCT's determination that the fact Sprint negotiates with a cable company does not constitute a failure by Sprint to offer its services, particularly its switching and interconnection with other telecommunications companies indiscriminately. Moreover, the Court notes that the record reflects no evidence before the PUCT of Sprint refusing to serve any end-user customer in a discriminatory fashion, and further, the PUCT's finding of fact to that effect goes unchallenged. *See Woolsey v. National Transp. Safety Bd.,* 993 F.2d 516, 524 (5th Cir.1993) (no evidence that plaintiff ever turned away any member who was able to pay fees). Moreover, the record reflects that Sprint has a tariff on file, and although not required for a carrier to be considered a common carrier, the tariff provides additional evidence that Sprint holds itself out to serve all potential users indifferently. *See id.* Additionally, the record reflects that Sprint advertises its wholesale interconnection service over the Internet, through product brochures, and at relevant industry trade

shows. Sprint offers the same array of services to all customers with suitable last-mile facilities, consistent with its Texas tariff, even though a customer's network configuration, as well as quantity, level, and extent of services purchased, may vary.

The Court also finds persuasive the Federal Communications Commission's ("FCC") declaratory ruling released March 1, 2007, by which the FCC reaffirmed that "wholesale providers of telecommunications services are telecommunications carriers for the purposes of sections 251(a) and (b) of the Act, and are entitled to the rights of telecommunications carriers under that provision." *In re Time Warner Cable,* 22 F.C.C.R. 3513, 3513 (2007), 2007 WL 623570 (F.C.C.) ("FCC Decision").[16] Further the FCC Decision provides, "[we] conclude that state commission decisions denying wholesale telecommunications service providers the right to interconnect with incumbent [local exchange carriers] pursuant to sections 251(a) and (b) of the Telecommunications Act are inconsistent with the Telecommunications Act and Commission precedent and would frustrate the development of competition." *Id.* "[W]e affirm today the rights of all wholesale carriers to interconnect when providing service to other providers...." *Id.* at 3519 n. 33. By its decision, the FCC declared that the Telecommunications Act does not differentiate between the provision of telecommunications services on a wholesale basis or on a retail basis and that providers of wholesale telecommunications services enjoy the same rights as any telecommunications carrier under the Telecommunications Act. *Id.*

The Court finds and concludes that Sprint is providing telecommunications services and indiscriminately offers its services so that they are effectively available directly to the public. Therefore, the Court agrees with the PUCT's finding that Sprint is a telecommunications carrier.

### Conclusion

Reviewing the record *de novo,* the Court finds and concludes that regarding the sole issue before this Court, whether Sprint is a telecommunications carrier under the Telecommunications Act, the PUCT interpreted the Telecommunications Act correctly. *See Southwestern Bell Tel. Co.,* 208 F.3d at 482. Further, the Court finds that the PUCT did not act arbitrarily and capriciously when it determined that "Sprint offers and will offer its services to all entities who desire to take them and who have comparable 'last mile' facilities suitable to function as residential loops" and concluded that "Sprint will be operating as a common carrier with respect to its interconnection with Consolidated." *Id.* Having determined that Sprint is a telecommunications carrier, which made a *bona fide* request for interconnection with Consolidated, the Court overrules Consolidated's contentions and will affirm the PUCT's Final Order.

**IT IS ORDERED** that the August 14, 2006 Order of the Public Utility Commission Of Texas, Docket Number 32582, which terminated Plaintiffs Consolidated Communications of Fort Bend Company and Consolidated Communications of Texas Company's exemptions and compelled Plaintiffs Consolidated Communications of Fort Bend Company and Consolidated Communications of Texas Company and

---

**16.** The FCC Decision leaves untouched previous state-commission determinations: "in this declaratory ruling proceeding we do not find it appropriate to revisit any state commission's evidentiary assessment of whether an entity demonstrated that it held itself out to the public sufficiently to be deemed a common carrier under well-established case law." *Id.* at 3523.

Defendant Sprint to arbitrate terms for interconnection for telecommunications services is **AFFIRMED.**

**IT IS FURTHER ORDERED** that Plaintiffs Consolidated Communications of Fort Bend Company and Consolidated Communications of Texas Company, **TAKE NOTHING** by their claims.

**IT IS FURTHER ORDERED** that the Preliminary Injunction rendered on February 28, 2007 (Clerk's Document No. 72) is **DISSOLVED.**

**IT IS FURTHER ORDERED** that Defendant Sprint's Motion For Reconsideration filed March 12, 2007 (Clerk's Document No. 75) is **DISMISSED AS MOOT.**

**IT IS FURTHER ORDERED** that this cause is **REMANDED** to the Public Utility Commission of Texas with instructions that the Commission provide the parties a reasonable period of time to implement their interconnection agreement.